V I R G I N I A :

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| COLETTE CUNNINGHAM, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| LOUDOUN COUNTY | ) | |
| SHERIFF'S OFFICE | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MICHAEL L. CHAPMAN, | ) | Jury Trial Demanded |
| Individually and Officially as Sheriff | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MARK POLAND | ) | |
| Individually and Officially | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ERIC PRUGH | ) | |
| Individually and Officially | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KENNETH DONDERO | ) | |
| Individually and Officially | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THOMAS GILLIGAN | ) | |
| Individually and Officially | ) | |
|     Defendants. | ) | |

## **COMPLAINT**

COMES NOW Colette Cunningham ("Cunningham"), by and through counsel,

and files this Complaint against Michael L. Chapman, ("Chapman") Sheriff of

Loudoun County, and other defendants.  In support thereof, Cunningham states as follows.

## SUMMARY OF THE COMPLAINT

1.      Cunningham was a First Lieutenant in the Loudoun County Sheriff's Office ("LCSO").  At the time of the incidents, Cunningham was the highest ranking female officer in the LCSO. Cunningham is the victim of discrimination based on her sex in that she received disparate treatment in her employment from that received by other like qualified male employees of the LCSO.  She has also suffered retaliation in the form of the denial of opportunity and disparate treatment as a result of her complaints against male officers.

2.      Cunningham timely filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and the Virginia Department of Human Rights. The EEOC issued a Notice of Right to Sue on August 31, 2023.

## PARTIES

3.      Plaintiff Cunningham is a natural person and citizen of the Commonwealth of Virginia residing in Loudoun County within this Court's jurisdiction.

4.      Defendant Loudoun County Sheriff's Office is a governmental entity, along with the Sheriff of Loudoun County, the employer of Cunningham and all deputies and Sheriff personnel in Loudoun County, Virginia.

5.      Defendant Chapman is, and was, at all times relevant to this Complaint the Loudoun County Sheriff, acting under the color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usages of the

Commonwealth of Virginia and/or Loudoun County. Sheriff Chapman along with his command staff and senior officers has responsibility over the policies and procedures of the deputy sheriff officers under the employ of the LCSO. Sheriff Chapman is directly responsible for the deputy sheriffs employed by the LCSO as their employment is based on his discretionary appointment.

6.     Defendant Poland was at all times relevant to this Complaint the Loudoun County Under-Sheriff, acting under the color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usages of the Commonwealth of Virginia and/or Loudoun County. Poland, along with Sheriff Chapman and his command staff and senior officers had responsibility over the policies and procedures of the deputy sheriff officers under the employ of the LCSO. Poland was employed by and was the agent of the Sheriff.

7.     Defendant Prugh was at all times relevant to this Complaint a Lt. Colonel in the LCSO, acting under the color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usages of the Commonwealth of Virginia and/or Loudoun County. Prugh acted in conjunction with Sheriff Chapman and along with his command staff and senior officers had responsibility over the policies and procedures of the deputy sheriff officers under the employ of the LCSO. Prugh was employed by and was the agent of the Sheriff

8.     Defendant Dondero was at all times relevant to this Complaint a Major with the LCSO, acting under the color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usages of the Commonwealth of Virginia and/or Loudoun County. Dondero acted in conjunction Sheriff Chapman and

3

along with his command staff and senior officers had responsibility over the policies and procedures of the deputy sheriff officers under the employ of the LCSO. Dondero was employed by and was the agent of the Sheriff

9.      Defendant Gilligan was at all times relevant to this Complaint a Captain in the LCSO, acting under the color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usages of the Commonwealth of Virginia and/or Loudoun County. Gilligan operated in conjunction with Sheriff Chapman and along with his command staff and senior officers had responsibility over the policies and procedures of the deputy sheriff officers under the employ of the LCSO. Gilligan was employed by and was the agent of the Sheriff

## JURISDICTION AND VENUE

10.     The Court has original jurisdiction of this matter pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States.

11.     Venue for this action lies properly in the United States District Court for the Eastern District of Virginia, Alexandria Division, pursuant to 28 U.S.C. § 1391, because this is a judicial district in which the Defendant resides, and all events giving rise to this action occurred in Loudoun County, Virginia, which is in this judicial district.

## FACTS

General Legal Principles

12.     Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits employment discrimination on the basis of sex. *See generally* 42 U.S.C. § 2000e-2(a)(1). "Title VII is a broad remedial measure, designed 'to assure equality of

employment opportunities.'" *Pullman-Standard v. Swint*, 456 U.S. 273, 276 (1982) (*quoting McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973)). Title VII prohibits both "overt employment discrimination," and "policies or practices that are neutral on their face and in intent but that nonetheless discriminate in effect against a particular group." *Id.* (*quoting Teamsters v. United States*, 431 U.S. 324, 349 (1977)). Additionally, Title VII prohibits an employer from retaliating against an employee for complaining about discrimination. 42 U.S.C. § 2000e-3.

13.     A Complainant has the initial burden to prove discrimination by a preponderance of the evidence. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). A Complainant may prove Title VII discrimination or retaliation "either through direct and indirect evidence of retaliatory animus, or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). If a complainant proceeds under the *McDonnell Douglas* burden-shifting framework, the complainant must begin by proving a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. Once a complainant has shown a *prima facie* case of discrimination, the burden of production then shifts to the employer to show that the employment action was taken "for a legitimate, nondiscriminatory reason." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). If the defendant carries its burden of production, the complainant then has an opportunity to show "that the proffered reason was not the true reason for the employment decision." *Id.* at 256.

14.     To allege a case of retaliation, Cunningham must allege three elements: "(1) that she engaged in protected activity, (2) that an adverse employment action

5

was taken against her, and (3) that there was a causal link between the protected activity and the adverse employment action." *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 258 (4th Cir. 1998). Protected activities consist of (1) "participating in an ongoing investigation or proceeding under Title VII" and (2) "opposition activity." *Id*. at 259. Opposition activity includes "utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Id*.

<u>LCSO and the Sheriff as employer</u>

15.    The qualified voters of each county and city in Virginia elect a sheriff. VA. CONST. ART. VII, § 4. The "sheriff is a constitutional officer and his duties are regulated and defined by . . . statute." *Hilton v. Amburgey*, 96 S.E.2d 151, 152 (Va. 1957). Although neither the constitution nor the Virginia Code explicitly creates a "sheriff's office," the Virginia Code uses this term repeatedly. See, e.g., VA. CODE ANN. § 15.2-1613 ("Any county or city may appropriate funds for the operation of the sheriff's office."); § 32.1-48.06 (defining law-enforcement agency as "any sheriff's office, police department, …or other agency or department"). *Briggs v. Waters*, 455 F. Supp. 2d 508, 513 (E.D. Va. 2006).

16.    A sheriff in his individual capacity is not an employer within the meaning of Title VII. *Briggs*, 2006 U.S. Dist. LEXIS 44048, 2006 WL 1982758 at *2; see also *Blankenship v. Warren County, Va.*, 931 F. Supp. 447, 449 (W.D. Va. 1996) (ruling that a Sheriff "cannot be held liable in his individual capacity under Title VII"). Implicit in this conclusion is the proposition that either the sheriff's office or the sheriff in his or her official capacity is an employer within the meaning of Title

VII. *See King v. McMillan*, 2006 U.S. Dist. LEXIS 51859, No. 05-521, 2006 WL 2126279, *1 (W.D. Va. July 28, 2006) (concluding that a sheriff was a proper defendant in her official capacity); *Wiatt v. Marrs*, 2005 U.S. Dist. LEXIS 3487, No. 04-461, 2005 WL 552563, *1 (W.D. Va. Feb. 22, 2005) (same); *Efird v. Riley*, 342 F. Supp. 2d 413, 420-21 (M.D.N.C. 2004) (noting that district courts in the Fourth Circuit have consistently assumed that "the office of sheriff" is properly named as an employer within the meaning of Title VII).

17.    Additionally, not only does the Virginia Code refer to both a sheriff and a sheriff's office, but the Virginia Attorney General, in interpreting the Virginia Code, has used the terms "sheriff's office" and "sheriff" interchangeably. See, e.g., Op. Va. Att'y Gen. 04-045 (2004) ("In counties without county police departments that rely on sheriff's offices to perform law-enforcement functions and serve as officers of the courts and local jailers, the local sheriff's office is the 'primary law enforcement agency.'"); Op. Va. Att'y Gen. 04-035 (2004) ("Ultimately, the decision whether a sheriff's office is complying with the standard uniform specifications would be determined by a civil proceeding in the appropriate circuit court.").

18.    Also, it is not uncommon for a sheriff's office to appear as a named party in Virginia courts. See, e.g., *Lindenfeld v. City of Richmond Sheriff's Office*, 25 Va. App. 775 (1997); *Stafford County Sheriff's Office v. DeBord*, 22 Va. App. 312 (1996). Accordingly, Cunningham may maintain her Title VII claims against the Sheriff's Office and the Sheriff in his official capacity.

19.    Further, in Virginia that the relationship between a sheriff and his deputies, is significantly different from the relationship between other state officers

7

and their employees. The Courts have ruled that the sheriff shall answer civilly for all the acts of his deputy. *James v. M'Cubbin*, 6 Va. (2 Call) 273, 274 (1800).

20.     There is a difference between master and servant; but a sheriff and all his officers are considered, in cases like this, as one person. *Miller v. Jones*, 50 Va. (9 Gratt.) 584 (1853).

21.     "The law looks upon the sheriff and his officers as one person: he is to look to his officers that they do their duty; for if they transgress, he is answerable to the party injured by such transgression; and his officers are answerable over to him." *Moore's dm'r v. Dawney and Another*, 13 Va. (3 Hen. & M.) 127, 132 (1808).

22.     On principles of public policy, the liability of a sheriff for his deputy is much more extensive than the general law regarding a master/servant relationship. "The acts and defaults of the deputy, *colore officii*, are considered in law as the acts and defaults of the sheriff, who is liable therefor [sic] in the same form of action as if they had been actually committed by himself. *Mosby v. Mosby*, 50 Va. (9 Gratt.) 584, 603 (1853).

23.     "The sheriff [is] answerable…for the act of his officer, the law looking upon the sheriff and all his officers as one person: He is to look to his officers that they do their duty; for if they transgress, he is answerable to the party injured by such transgression, and his officers are answerable over to him. There is a difference between master and servant; but a sheriff and all his officers are considered, in cases like this, as one person." *Id*., quoting Justice Blackstone in *Saunderson v. Baker*, 3 Wils. R. 309 (Court of Common Pleas 1772).

24.    For example, applying Virginia law, the United States District Court for the Eastern District of Virginia found *Miller* still controlling law and held that a sheriff may be held vicariously liable for state law malicious prosecution. *White v. Chapman*, 119 F. Supp. 3d 420, 430 (E.D. Va. 2015)

25.    Sheriff Chapman is jointly liable for all violations of law committed by Poland, Prugh, Dondero, and Gilligan and any other LCSO personnel.

Overview and General Background

26.    Loudoun County Sheriff's Office (LCSO) is the largest Sheriff's Office in the Commonwealth of Virginia. According to the LCSO's reporting to Wikipedia, as of April 24, 2021, the LCSO has 794 employees. 584 of the employees are sworn deputies and 210 are "civilians". It is run by Sheriff Michael L. Chapman who was last re-elected in 2023 for a four year term.

27.    According to Loudoun County websites, the Sheriff's Office is led by one Sheriff, one Undersheriff who has the rank of Colonel, two Lieutenant Colonels, five Majors, and one Acting Major. In addition to this command structure, the Loudoun County website identifies 6 Captains. All of these positions are filled by men, and all but one of these 16 individuals are white men.

28.    The LCSO is organized into Command Staff, which is comprised of the Sheriff, Undersheriff, and the two Lt. Colonels; Administrative/Technical Services Division which is run by a Major; Corrections Division (Adult Detention Center) which is run by a Major who is assisted by a Captain; Court Services Division which is run by a Major who is assisted by a Captain; Criminal Investigations Division which is run by a Major; Operational Support Division which is run by a Major who

is assisted by a Captain; and the Field Operations Division which is run by an Acting Major who is assisted by three Captains and a First Lieutenant (each of the Captains is assisted by a First Lieutenant).

29.    Additional supervisory officers have the rank of Sergeant, Second Lieutenant, and 1st Lieutenant. At the time of events pertinent hereto, in the Loudoun County Sheriff's Office, Cunningham was a 1st Lieutenant and the highest ranking female officer in the LCSO. No women held the rank of Captain or higher. There were two women who held the rank of 1st Lieutenant (including Cunningham), and one woman who held the rank of Second Lieutenant.

30.    Regarding all promotions from November 28, 2016 to May 2021, 126 promotions were provided to men and nine were provided to women, with six of the women's promotions being made to three women who were each promoted twice in the last five years.

31.    According to General Order 313.6, "Sworn personnel seeking promotion to Sergeant, Second Lieutenant, and First Lieutenant shall compete for advertised positions in their respective career path... Promotion to Captain and Major shall be open to all qualified personnel regardless of their career path. The Sheriff retains the authority to make all appointments to the rank of Major or higher without competitive procedures." GO 313.6, section III.

32.    The General Order is internally inconsistent in that GO 313.6, Section III(D) indicates: "All promotions to the rank of MDS, Sergeant, Second Lieutenant, First Lieutenant, and Captain will be accomplished through a competitive selection process." However, there is no competitive process for promotion to Captain or for

First Lieutenant.  A competitive process requires a competition.  There is no written test or identification of criteria on which a candidate for First Lieutenant or higher can evaluate themselves and see how they did in relation to other candidates.  There is no physical exam, administrative process exam, leadership exam, survey of subordinates, or any other identified process for evaluating candidates to higher positions of authority within the LCSO.

33.    Although General Order 313.6 requires a formal competitive process for promotions to First Lieutenant, no such process is followed by the Sheriff, in practice, there is no competitive process for promotion to the ranks of First Lieutenant and above.

34.    The selection process for First Lieutenant merely consists of an interview with the Sheriff, as does the selection process for all ranks above Second Lieutenant. Cunningham has not been provided with any evidence of any "Assessment Center" or the use of law enforcement officers from other jurisdictions to evaluate any promotions.  She has not been provided any information of the existence of such a "Center," its composition, and when and where it meets. Her promotion to First Lieutenant consisted of nothing other than an interview with the Sheriff.

35.    Not only does the LCSO not conform to its own General Orders and provide a competitive exam for promotion to First Lieutenant or Captain, the Sheriff does not provide or comply with his stated policy of not considering a candidate's race, color, religion, sex, national origin, age, etc. as a factor in promotion.

36.    The Sheriff admitted the disparity with regard to gender in promotion by stating in paragraph 5 of his Position Statement to the EEOC that "no female deputies were included on the 2019 eligibility list for the rank of Captain." Since the only position-specific criteria for being promoted to Captain is allegedly "one year of overall experience as a First Lieutenant or higher-level supervisor within the deputy's path," GO 313.6(I)(C), not only is it difficult to imagine a competition around that sole criteria, but that criteria becomes a false barrier used to deny women promotions. If there are no female First Lieutenants, then there can never be female Captains or higher officers.

37.    Further, the reality of the LCSO with regard to "position specific requirement" is discriminatory. The uniform application of these requirements are subject to the discretion of the Sheriff and are not adhered to. For instance, the requirement for promotion to Captain allegedly, by General Order, as identified above, requires "one year of overall experience as a First Lieutenant or higher- level supervisor within the deputy's path." The General Orders do not define "higher- level supervisor." As a consequence, the Sheriff is within his discretion to promote anyone who has supervisory experience, regardless of the time spent in grade as a First Lieutenant, and has done so.  The General Order is only used as a basis for denying promotions, and specifically denying promotions to women and to Cunningham.

38.    Contrary to the stated policy of the General Orders, some of the men who have been promoted in the Department have been promoted without meeting the requisite time in grade. For example, Kenneth Dondero was promoted to 1st Lieutenant on November 17, 2017 and promoted to Captain seven months later on

June 14th, 2018. He did not have one year of service as a First Lieutenant prior to promotion. No explanation for this deviation from the General Orders for a male is provided.

39.     Promoting male officers to "Acting" roles, or having an officer fulfill the role of a senior position and then following that with full promotions is a standard practice in the LCSO and one that has not been applied to female officers. For example, Rudy Landon became a Captain and then was an "Acting Major" for approximately 7 months prior to being promoted to Major; Kenneth Dondero was promoted to Captain after only being a First Lieutenant for 7.5 months.  He then was made an "Acting Major" for 2.5 months before being fully promoted to that position. Easton McDonald was a Captain holding the responsibilities of a Major for approximately 7 months before being promoted.  Cunningham, the only woman to run a station for the LCSO, did so for nine months.  While performing this Captain's job, she was neither given the title of "Acting" or being promoted. None of the men listed above performed the responsibilities of a senior position for as long as Cunningham (9 months) without being given the title of "Acting" or being promoted.

40.     **There can be no explanation to justify the fact that the top 16 people in the Sheriff's Office are all men, and 15 of them are white men.  All are selected without competitive evaluation and are selected solely through the exercise of the Sheriff's discretion**. What is more striking is that the Sheriff determined that no women were eligible for promotion to the rank of Captain in the alleged 2019 process, even though Dondero's promotion demonstrates that it is within the Sheriff's authority and practice to promote individuals based

upon his discretion.    His discretion just discriminates against women, and Cunningham specifically.

41.    **It is clear that a general atmosphere that discriminates against women pervades the LCSO. Since Sheriff Chapman took office in 2012, only one woman attained the rank of Captain or higher, and that woman was promoted to Major and then demoted to Captain prior to her retirement in 2016.  Under Sheriff Chapman's tenure, prior to Cunningham filing her EEOC Complaint, no male has ever been demoted after attaining the rank of Captain or higher.  No other woman has ever been promoted to Captain or higher and only two have attained the rank of First Lieutenant. It is in this atmosphere of systemic gender discrimination that First Lieutenant Colette Cunningham's complaint must be evaluated**.

Colette Cunningham's Complain

42.    Colette Cunningham is a First Lieutenant, who, at the time of her EEOC complaint, had the *de facto* role of "acting captain" without the benefit of formal rank; and, ran the Eastern Loudoun Station after the Captain assigned to that position was relocated after complaints of his harassing Cunningham and other unprofessional action, and who was relieved of her *de facto* role despite stellar performance.

43.    Cunningham had been a law enforcement officer for over twenty years, eighteen of them with the LCSO.

44.     In January 2020, Cunningham was promoted to First Lieutenant, one of only two women in that rank.  These two women were the highest ranking women in the LCSO.

45.     Despite Cunningham's success in her jobs and her almost two decades of experience, she, like other women in equal ranks, were not given promotions, even though they had similar or superior qualifications to the men who received the promotions. Two senior officers, both white men, Captain David Hill and Major Chris Sawyer, were at the LCSO significantly less time than either Cunningham or the other female First Lieutenant and neither had the operational experience of Cunningham (narcotics, property crimes, robbery/homicide, etc.,); yet both were promoted to the rank of Captain without competitive process while Cunningham was not.

46.     As First Lieutenant, Cunningham was assigned to assist Captain Thomas Gilligan, who was the Captain running the Eastern Loudoun Station. Gilligan had been the subject of previous complaints from women and minorities for bias and harassment on the job based on the complainant's gender and/or race.

47.     From January 2020 until June 2020, Cunningham was subject to repeated acts of harassment by Gilligan, including his "warning" her that her subordinate was keeping a thick file on her.

48.     After Cunningham properly documented this harassment and made several complaints that she was being discriminated against based on her sex, Gilligan was removed from the Eastern Loudoun Station and placed at Headquarters.

49.     However, in retaliation against Cunningham for bringing the complaints against Gilligan, while removing Gilligan from daily supervision of Cunningham, the Sheriff left Gilligan as Cunningham's supervisor for purposes of writing her performance reviews. This permitted Gilligan to write negative reviews about the person who exposed his discrimination, allowing Gilligan to negatively impact Cunningham's promotability. Cunningham was compelled to complain about these reviews, which were eventually rescinded by the Sheriff.

50.     To document Gilligan's discrimination, Cunningham, as well as others, lodged formal complaints. Cunningham emailed Major Kenneth Dondero on May 20, 2020 after enduring 3-4 months of harassment and bullying by Gilligan. Receiving no response, on June 4, 2020, Cunningham emailed the Sheriff and Colonel Mark Poland directly after being personally compelled to take 7 working days off in order to remove herself from the toxic environment of working with Captain Gilligan.

51.     Captain Gilligan was moved from the station in June 2020 due to Cunningham's complaint. Despite this, in August 2020, he was allowed to complete Cunningham's performance evaluation and he remained Cunningham's direct supervisor until March 4, 2021 (10 months after his removal).

52.     When Gilligan was removed from command of the Eastern Loudoun Station, the responsibility for running the station fell to Cunningham. The assertions in Paragraph 8 of the Position Statement files by the Sheriff with the EEOC reveal the extent of the discrimination against Cunningham. **The Sheriff asserted that "from June 15, 2020 until March 4, 2021, the Eastern Loudoun Station was without a Station Commander." This intentional statement**

**misstates reality and was designed to cover up the Sheriff's discrimination against Cunningham**.

53.     As detailed below, Cunningham effectively was that Station's Commander.   Cunningham was consistently identified as the recipient of email correspondence that Command Staff sent to Station Commanders.   Yet, as reflective of the apparently ingrained discrimination against Cunningham based on being female, it is true that despite requiring her to perform as the Station Commander and treating her operationally as if she was Station Commander, "Cunningham was not appointed to serve as "Acting Station Commander." Para. 7 of the EEOC Position Statement.

54.     After Gilligan's removal, Cunningham was required to take over the duties of the Station Commander, duties that were those of a Captain. She was included on the email traffic that went to Station Commanders only. She participated in all the Station Commander briefings and operated as the senior officer for the Eastern Loudoun Station from June 2020 through March 2021. The Easter Loudoun Station covers the greatest percentage of the population in Loudoun County among the four Stations and has always been commanded by a Captain.

55.     Unlike the other male commanders of the different stations, Cunningham was not provided an administrative assistant. In addition to not being provided an administrative assistant, as were provided to other Station Commanders, her duties to fulfill the role of Station Commander included:

- Handling all station inquiries from all personnel reporting to the Eastern Loudoun Station (approx. 50-60 deputies)

- Being the point of contact and being called by all of patrol when an incident occurred in Sterling (as part of the required notification to Station Commander)
- Being in contact with all Board of Supervisors in Station 2 (Station Commander responsibility)
- Compiling and presenting all station statistics as requested by Lt Colonel Prugh for BOS meetings, etc.
- Running the Eastern Loudoun Station Quarterly Meeting and preparing the presentation and agenda for the meeting
- Preparing and presenting the station case presentation to command staff
- Being the point of contact for all communication in regards to maintenance issues at the station
- Participated in the weekly LCSO Operations Bureau Meetings as the representative of the Station
- Preparing and implementing the Eastern Loudoun Station budget for purchases

Cunningham performed the following specific operational tasks as the *de facto* Station Commander:

- Created New Station Sergeant daily guidance and assistance
- Conducted 2020 Juvenile Justice and Delinquency Prevention Act virtual site visit (08/17) with Kenneth Stables from Va Dept. of Criminal Justice Services (virtual)
- Met with or engaged with Supervisors Briskman (she made a suspicious person report), Saines (calls for traffic issues) and Glass (met with Glass and Capt. Hibberd)
- Maintained weekly contact with patrol Sergeants with updates from station and extra patrols/report guidance/station news (patrol received thank you due to directed patrols Cunningham recommended in Lowes Island after vehicle tampering incidents)
- Updated Station statistics (updated everyday)
- Handling all Station Inquiries/Complaints from Command Staff
- Signed off and assigned Station 3 reports/cases while Sgt. Vermeer out for 2 weeks vacation
- Signed off/assigned Station 2 reports while Sgt. Harwood was out on M/L, Covid leave and A/L (4 weeks)
- Met with Providence Village HOA in reference to armed/unarmed security
- Acted as the Hospital liaison and Patrol/CA Issues liaison
- Set up Station 2 Intel meeting and Quarterly Meeting (completed powerpoint for QM)

- Initiated follow ups for day shift at Eastern Loudoun Station due to four gunfire complaints over 09/05 weekend
- Orchestrated patrol response due to mall units leaving the mall (started 09/17)
- Initiated new Station 2 crime analyst schedule with other analysts to get training
- Called in every week off for the Operations Bureau meeting to represent Station and to stay on top of information
- Continually changed schedule to ensure station is staffed
- Had ELS building checked through General Services due to mold in locker rooms
- Obtained new crime analyst (approx. 4 months without)
- Prepared and conducted ELS Quarterly powerpoint and presentation 10/15
- Set up the Operation for 10/19 related to work van larcenies
- Initiated an ELS patrol geared bulletin for extra assistance on traffic/quality of life issues (Weekly - Wrap) which was adopted by other stations as well.
- Initiated Operations at Trump Golf Course starting 08/08/20 through 12/13/20; lasting the majority of weekends (Sat and Sun) from 0800-1700 due to protests.
- Coordinated with those working the operations at Trump Golf Course even on weekends off to ensure consistency. Ensured they were staffed every weekend. Came out several weekends when there was not sufficient coverage.
- Initiated operations or racing on: 09/11, 09/18, 11/06 and 11/13, 12/04, 12/11 (requested additional manpower from OSD) and also for 12/18 , 12/26, 01/07 and 01/15, 02/05.
- Acted as liaison with hospital staff and EMS due to COVID
- Coordinated Amazon communication during online threats week of 01/12
- Continued communication with all station Sergeants regarding Station 2 information
- Responded to officer involved shooting for Station 2 representation
- Wrote proposal regarding adding Station position (traffic unit)
- Handled over 30 online complaints delegated from command staff since June 2020
- Met with DCTI/Courtland at Cascades HOA 02/09/21 on issues
- Station presentation to the Command Staff for Station 2

56.    Additionally, Cunningham, while performing all the operational

requirements as the *de facto* Station Commander, from July 1, 2020 through late

March 2021, performed the following administrative duties as she was without the administrative assistance provided to other Station Commanders:

- Requisitioned and obtained new VCIN printer requested by detectives so color photos could be printed with DMV photos
- Requisitioned and obtained new CD burner in detective office
- Requisitioned and obtained new detective printer as old one was broke (DIT/Xerox)
- Requisitioned and obtained new detective monitors
- Established HotSpot for detective phones
- Ordered and facilitated removal of surplus Jacobs ladder from gym
- Requisitioned and obtained all office supplies ordered for station
- Requisitioned and obtained new water fountains for ELS (completed)
- Handling all communication in regards to station for maintenance, supplies, updates, etc.

57. At no time did Cunningham receive assistance from the Station Commanders in the Eastern end of the County or from the Division Commander.

58. Cunningham was responsible for all the duties of the Station Commander, as well as her duties as a First Lieutenant. Aside from answering basic questions or providing the same information as provided to the other Station Commanders, Cunningham was not "helped" in any capacity or received any assistance. No other person made any report, took any call, prepared for any meeting, or interfaced with Command Staff on behalf of the Station. To the contrary, Cunningham was advised by the other Station Commander Captains that Command Staff would hold her responsible if things were not taken care of at the station.

**59. There is no validity to any assertion that Cunningham was not recognized as the _de facto_ Station Commander from June 2020 through March 4, 2021, yet she was not given the rank or title (Captain or "Acting Captain" and "Station Commander" or "Acting Station Commander"),**

20

**recognition and promotion given to other men upon the assumption of similar duties.  This was discrimination based on her sex and in retaliation for complaining against Thomas Gilligan.**

60.    While acting as Station Commander, Cunningham was also required to fulfill her role as First Lieutenant Duty Officer.  The Sheriff established "Duty Officers" in 2014.  The Duty Officers were the Operations Division's four First Lieutenants (one from each of the four Stations) and each First Lieutenant was responsible for being the on-call point of contact for the entire County during their rotating shift.  This shift work required work on the weekends and nights.  Station Commanders, because of their increased responsibility and reporting requirements, do not participate as Duty Officers or work shift work.  Instead, they work a Monday through Friday schedule.

61.    From September 2020 through February 2021, while working as the *de facto* Station Commander, Cunningham requested, at least once a month, that Major Dondero permit her to work Monday-Friday as she was acting as the Eastern Loudoun Station Commander (without being given the title of "Acting Commander") and that she be removed from the Duty Officer rotation due to the amount of responsibility and work she was performing as the *de facto* Station Commander. At the time, Cunningham was working every day without a break, either in the her role as *de facto* Station Commander or as a First Lieutenant. Dondero, in discrimination against Cunningham based on her sex, and as part of the retaliation for bringing the complaint against Gilligan, continually denied these requests. When Cunningham appealed to Poland and the Sheriff, they too, in discrimination against Cunningham

based on her sex, and as part of the retaliation for bringing the complaint against Gilligan, continuously denied her requests.

62.     In October 2020, Cunningham advised Major Dondero of the impact this schedule was having on her home life and mental health, as she had no time off, was consistently tired, and had no time with her children. First Lieutenant Kim Holway and First Lieutenant John Buckman both asked Major Dondero during September/October 2020, on Cunningham's behalf, to have Cunningham removed from the Duty Officer rotation.  These requests were also denied as an act of discrimination and retaliation.

63.     At one point, Cunningham reached out to her LCSO and Loudoun County HR specialist, Tiffany Hoffman, and asked if her onerous schedule was acceptable. Cunningham was advised by Tiffany Hoffman to "keep asking Major Dondero." No relief was afforded and this schedule continued until Captain Ahleman, another recently promoted white male officer, was moved to the Eastern Loudoun Station on March 4, 2021 and relieved Cunningham of her duties as *de facto* Station Commander.

64.     From June 2020 through March 4, 2021, among the *de facto* and *de jure* Station Commanders, only Cunningham, the only woman in the role of running a station, was required to perform shift work, and was not permitted a Monday through Friday schedule.

65.     The refusal to promote Cunningham to "Acting Captain" or Captain and to formally assign her the role of Station Commander is reflective of sex discrimination and retaliation against Cunningham for filing complaints against

Gilligan. This is more apparent when one examines the illogical and absurd rationale for disparate treatment of a male First Lieutenant who, after March 4, 2021, was removed from shift work while assuming the *de facto* role of Station Commander.

66. The Sheriff identified in his filings with the EEOC that the four First Lieutenants who are the Assistant Station Commanders for the four stations (Eastern Loudoun, Ashburn, Dulles South, and Western Loudoun stations) were organized as Duty Officers to run the A and B squads on shift detail. While on shift as a Duty Officer, the First Lieutenant is responsible for handling matters and providing supervision throughout the entire County. As a consequence, Cunningham, even though she worked primarily in Eastern Loudoun, was required to respond to matters in Dulles South, or Western Loudoun, or Ashburn, while she was on shift. The other First Lieutenants had the same responsibility for the entire County while performing shift work, regardless of where their primary duty station was located. However, the other First Lieutenants were not the *de facto* station commander of their assigned station. Prior to March 2021, Cunningham, who was the *de facto* station Commander for the Eastern Loudoun Station, was required to perform both jobs and respond to matters in Western Loudoun while she was on shift, regardless of the geographic distance of this station from the three stations in the Eastern part of the County.

67. Cunningham, who had been running the Eastern Loudoun Station since June 2020, repeatedly requested that she be given the title of Acting Captain or promoted to Captain. This was refused by Poland and Chapman. In February,

2021, Prugh, with the cooperation of other members of the command staff, coordinated to create a false issue regarding Cunningham's performance in order to "justify" their refusal to promote her or give her the equivalent rank of male officers.

68.    On February 18, 2021, Prugh, as a member of the Command Staff and third highest ranking officer in the Loudoun County Sheriff's Office sent an email to Cunningham at 7:07 in the morning. Cunningham was not working that day but was the County's Duty Officer for patrol and was to handle any major patrol incidents. In that email, which appears to be another attempt at setting up Cunningham for discipline, Prugh specifically asked Cunningham to provide "any updates on patrol calls and operations during the snow emergency for this morning. Include OSD assets that are working split shifts (a.m. and p.m. groups)." This request did not involve any major patrol incidents.

69.    At 7:43 Cunningham provided a response, stating that she had reached out to the officer who was actively working at the time, Lieutenant Johnson. She also stated: "Sounds like Tom [Gilligan] already reached out to get updates from him [Lieutenant Johnson] so I'm not going to have Johnson calling multiple people. I advised Johnson just to keep Gilligan apprised unless it's something patrol call specific. Earley will be out at noon."

70.    This response was designed to inform Lt. Colonel Prugh that his request was being handled even though Cunningham was not the officer in charge of non-patrol issues. Despite this, Prugh "wrote her up" for "failure to respond" and "being insubordinate." It is not coincidental that Gilligan was also involved. Cunningham challenged this and appealed to Chapman, who ignored her request to

overturn the matter as she was not on patrol at the time and another officer was handling the request. Notably, if Cunningham had been treated as other officers who were running a station, she would not have had any patrol duties.

71.    The next month, in early Spring 2021, after Cunningham again requested a change in her schedule, the captain who handled the Western Loudoun Station was suddenly transferred to the Eastern Loudoun Station and Cunningham, from a job perspective, was "demoted" to only operating as a First Lieutenant. Although she ran the Eastern Loudoun Station for nine months, she was not made a captain nor was she made an "acting captain" and given any pay or scheduling benefits of that position. This professional snub of Cunningham, and the fake report by Prugh, was in retaliation for her complaining against Gilligan and demanding equal treatment given her position and responsibilities

72.    In March 2021, after 9 months of highly successful and satisfactory performance as the *de facto* Station Commander of the Eastern Loudoun Station, Cunningham was relieved of her duties and the Station Commander from Western Loudoun Station, Captain Ahleman, was transferred to be the Station Commander at the Eastern Loudoun Station.  No fitness report or other documentation was ever created or presented to suggest that Cunningham was anything other than successfully meeting the responsibilities of the position, despite receiving no administrative support and not receiving either the rank or title associated with the position.

73.    More troubling and indicative of both sex discrimination and retaliation, upon the transfer of the Western Station Commander to the Eastern

Loudoun Station, the male First Lieutenant now in charge of the Western Loudoun Station and operating as the *de facto* Station Commander of that Station after Ahelman's transfer, was removed from shift work and assigned a Monday through Friday schedule due to the increased responsibility.

74.     The Sheriff justified this accommodation to a male First Lieutenant fulfilling the role of station commander was justified "because of the geographic distance of this station from the three stations in the populous eastern end of the County, it is not feasible to have that 1st [sic] Lieutenant serve as a Duty Officer at this time."

75.     **Despite denying Cunningham's request for this accommodation, the Sheriff provided the same accommodation of removing from shift work a male First Lieutenant who was now serving as the *de facto* Station Commander. There is no credence to the argument that "geographic distance" makes it "not feasible" for this officer to perform shift work but such "geographic distance" was not a factor in deciding that Cunningham would have to continue to perform shift work, as the Loudoun County's geography has not changed. Since Duty Officers are responsible for the whole county, Cunningham, when acting as duty officer, is still responsible for activities in the Western Station area.  Apparently, according to the Sheriff, "geography concerns" only negatively affect the feasibility of men in the performance of their jobs.**

76.     To justify the denial of Cunningham's request for accommodation, the Sheriff stated: "Because of the need to have 1st [sic] Lieutenants serve as Duty

Officers, it was not possible for Cunningham to have a Monday through Friday schedule, which is why Major Dondero did not grant her requests for same." However, no rational explanation is provided to explain why it was possible for First Lieutenant Buckman, the now *de facto* Station Commander of the Western Loudoun Station, to have a Monday through Friday schedule since he is a First Lieutenant and there is a "need to have 1st [sic] Lieutenants serve as Duty Officers."

77.     Given that the same geography separates the Western Loudoun Station from the Eastern Loudoun Station as does the Eastern Loudoun Station from the Western Loudoun Station, the only explanations for the disparate treatment of Cunningham as compared to her male contemporary of the same rank are discrimination based on sex, and retaliation. There is no evidence that Buckman filed a complaint against his supervisor for sex discrimination.

78.     Denial of rank, title, and opportunity for advancement, as well as disparate treatment of similarly situated individuals are manifestations of discrimination that should not be tolerated.

## COUNT ONE
### Violation of 42 U.S.C. § 2000e
### (Against LCSO and Sheriff Chapman in his Official Capacity)

79.     Cunningham adopts the allegations set forth in the preceding paragraphs.

80.     Cunningham engaged in protected activity when she filed a complaint against Gilligan alleging illegal discrimination based on gender.

81.     LCSO, by and through the Sheriff and other officers, and the Sheriff also discriminated against Cunningham and retaliated against Cunningham for this

protected activity through a variety of actions, including, but not limited to, the following:

      a.      Failing to remove Gilligan as her performance evaluator thereby failing to take effective action to remedy Gilligan's discriminatory conduct;

      b.      Orchestrating Prugh's complaint against her as a pretext to discipline her;

      c.      Failing to give her the title of "Acting Captain" or promoting her when she was performing a captain's job for more than 9 months;

      d.      Refusing to modify her schedule similar to all other officers running a station and performing the job of a captain;

      e.      Disciplining Cunningham with a "write up" by Prugh; and

      f.      "Demoting" her despite her proving herself capable of handling the position of captain in running the County's largest station.

      82.      Additionally, the Defendants are liable for the actions of Gilligan and the failure to adequately address his sex discrimination by maintaining him as Cunningham's reviewing supervisor. LCSO and the Sheriff violated Title VII as Cunningham's workplace was permeated with gender based intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of the Cunningham's employment and created an abusive working environment. See *Howard v. Winter*, 446 F.3d 559, 565 (4th Cir. 2006).

      83.      Gilligan's conduct (1) was unwelcome, (2) was based on Cunningham's sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment

and create an abusive work environment, and (4) is imputable to her employer. See *Id*.

84.     The Defendants acted with malice and with a conscious and reckless disregard for Cunningham's federally protected rights.

85.     The Defendants' actions have caused and will continue to cause Cunningham substantial economic loss, including lost salary, bonuses, benefits, and other compensation.

86.     The Defendants' actions have caused and will continue to cause Cunningham significant emotional distress, including anxiety, depression and other physical manifestations, as well as damage to her reputation.

87.     Due to the conscious and reckless disregard for Cunningham's federally protected rights, and the severity of the Defendants' conduct, Cunningham is also entitled to punitive damages.

88.     Cunningham seeks compensation.

## COUNT TWO
### Denial of Equal Protection in Violation of 42 U.S.C. § 1983
### (Against All Defendants)

89.     Cunningham adopts the allegations set forth in the preceding paragraphs.

90.     Cunningham engaged in protected activity when she filed a complaint charging the Sheriff and other Defendants with illegal discrimination based on sex in the disparate treatment of her compared to male officers, and the failure to promote her to Captain or give her the title of Acting Captain and in refusing to modify her schedule given her job duties.

91.     Section 1983 creates a cause of action for a person deprived of "any rights, privileges, or immunities secured by the Constitution and laws" by any person acting under color of state law. 42 U.S.C. § 1983. The Fourth Circuit has explained that "the equal protection clause confers on a public employee a federal constitutional right to be free from gender discrimination" and that "sexual harassment has long been recognized to be a type of  gender discrimination." *Beardsley v. Webb*, 30 F.3d 524, 530-31 (4th Cir. 1994). The elements that establish a prima facie case of discrimination under Title VII also establish a prima facie case of discrimination under § 1983. *Gairola v. Virginia Dept. of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985).

92.     The Defendants discriminate against Cunningham and retaliated against Cunningham for making the complaint against Gilligan through a variety of actions, including, but not limited to, the following:

a.     Failing to remove Gilligan as her performance evaluator thereby failing to take effective action to remedy Gilligan's discriminatory conduct;

b.     Orchestrating Prugh's complaint against her as a pretext to discipline her;

c.     Failing to give her the title of "Acting Captain" or promoting her when she was performing a captain's job for more than 9 months;

d.     Refusing to modify her schedule similar to all other officers running a station and performing the job of a captain;

e.     Disciplining Cunningham with a "write up" by Pugh; and

f.      "Demoting" her despite her proving herself capable of handling the position of captain in running the County's largest station.

93.    The actions of the Defendants created a hostile work environment for Cunningham.

94.    The Defendants' actions have caused and will continue to cause Cunningham substantial economic loss, including lost salary, bonuses, benefits, and other compensation.

95.    The Defendants' actions have caused and will continue to cause Cunningham significant emotional distress, including anxiety, depression and other physical manifestations, as well as damage to her reputation.

96.    Due to the conscious and reckless disregard for Cunningham's federally protected rights, and the severity of the Defendants' conduct, Cunningham is also entitled to punitive damages.

97.    Cunningham seeks compensation.

**COUNT THREE**
**Violation of 42 U.S.C. § 1983**
**(Against LCSO and the Sheriff)**

98.    Cunningham adopts the allegations set forth in the preceding paragraphs.

99.    The execution of a policy or custom of the LCSO caused Cunningham's deprivation of rights. See *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004).

100.   Additionally, Chapman possesses "final authority" to establish LCSO policy with respect to the actions taken by the LCSO regarding Cunningham. It is clear that a sheriff has final decision-making authority for such decisions. *Jenkins v.*

*Weatherholtz,* 909 F.2d 105, 107 (4th Cir. 1990) (explaining that "sheriff's deputies are at will employees serving at the discretion of their sheriffs").

101.   The Defendants' actions have caused and will continue to cause Cunningham substantial economic loss, including lost salary, bonuses, benefits, and other compensation.

102.   The Defendants' actions have caused and will continue to cause Cunningham significant emotional distress, including anxiety, depression and other physical manifestations, as well as damage to her reputation.

103.   Cunningham seeks compensation.

### COUNT FOUR
### Violation of Virginia Human Rights Act
### (Against LCSO and the Sheriff)

104.   Cunningham adopts the allegations set forth in the preceding paragraphs.

105.   Pursuant to Virginia Code § 2.2-3905, it is an unlawful discriminatory practice for an employer to discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment because of such person's sex.

106.   The LCSO and Chapman, in their treatment of Cunningham, applied different standards of compensation, or different terms, conditions, or privileges of employment based on Cunningham's sex and manifest an intention to discriminate against Cunningham because of her sex.

107.   The Defendants' actions have caused and will continue to cause Cunningham substantial economic loss, including lost salary, bonuses, benefits, and other compensation.

108.   The Defendants' actions have caused and will continue to cause Cunningham significant emotional distress, including anxiety, depression and other physical manifestations, as well as damage to her reputation.

109.   Cunningham seeks compensation.

## PRAYER FOR RELIEF

WHEREFORE Cunningham prays that this Honorable Court award her judgment in her favor and award damages in an amount not to exceed $11,500,000 and to award such other relief as the Court deems just and appropriate.

**Trial By Jury is Requested**


COLETTE CUNNINGHAM
By Counsel


WESTLAKE LEGAL GROUP

_____*/s/ Thomas K. Plofchan, Jr.*_____
By: Thomas K. Plofchan, Jr., VSB # 34536
46175 Westlake Drive, Suite 320
Potomac Falls, Virginia 20165
(703) 406-7616 – Telephone
(703) 444-9498 – Facsimile
Email: tplofchan@westlakelegal.com