**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| COLETTE CUNNINGHAM,<br><br>Plaintiff,<br>v.<br><br>LOUDOUN COUNTY SHERIFF'S OFFICE, *et al.*,<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Case No.: 1:23-cv-01626-MSN-LRV |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant, Loudoun County Sheriff's Office, by and through counsel, and files this memorandum in support of its Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 as to the remaining claims of Plaintiff, Colette Cunningham's Amended Complaint, states as follows:

## INTRODUCTION

On March 18, 2021, the Plaintiff, Colette Cunningham, filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") and the Virginia Department of Human Rights. (Am. Compl. ¶ 2). Plaintiff states that "[t]he EEOC issued a Notice of Right to Sue on August 31, 2023." (Am. Compl. ¶ 2).[1] Ninety days later, on November 29, 2023, Plaintiff filed her Complaint against Defendant, Loudoun County Sheriff's Office (the "LCSO"), as well as Michael Chapman, Mark Polland, Eric Prugh, Kenneth Dondero, and Thomas Gilligan. (ECF No. 1). Prior to serving any of the named defendants, Plaintiff filed an Amended Complaint on February 22, 2024. (ECF No. 2).

[1] Although Defendant requested all documents exchanged with the EEOC, the Notice of Right to Sue was never produced during discovery.

The Amended Complaint asserted five counts: "Discrimination and Retaliation pursuant to 42 U.S.C. § 2000e (Against LCSO and Sheriff Chapman in his Official Capacity)" (Count One); "Denial of Equal Protection in Violation of 42 U.S.C. § 1983 Discrimination, Retaliation, Failure to Promote (Against All Defendants)" (Count Two); "Violation of Title VII of the Civil Rights Act of 1963 (Against Gilligan, LCSO, and the Sheriff)" (Count Three); "Violation of 42 U.S.C. § 1983 Policy and Custom Violation (Against LCSO and the Sheriff)" (Count Four); "Violation of the Virginia Human Rights Act (Against LCSO and the Sheriff)" (Count Five). (ECF No. 2). The basis for her claims is the contention that, as a result of her gender and as a result of retaliation, from June 2020 through March 2021, Plaintiff was (1) performing the duties of a captain but not named "Acting Captain" or paid as a captain, (2) was denied a Monday through Friday schedule while performing the duties of a captain, and (3) was "demoted" to her rank of First Lieutenant and not promoted to captain despite performing the duties of a captain.

The defendants moved to dismiss Counts Two, Three, Four, and Five, as well as Chapman in his official capacity as being duplicative of the LCSO. (ECF Nos. 12 – 13). This Court granted the motion to dismiss, leaving Count One, Plaintiff's Title VII discrimination and retaliation claim against the LCSO. Based on the undisputed facts, Plaintiff cannot establish a Title VII gender discrimination claim or a Title VII retaliation claim and the LCSO seeks judgment as a matter of law.

**STATEMENT OF UNDISPUTED FACTS**

1. From 2019 through 2021, the Loudoun County Sheriff Office (the "LCSO") operated with the following ranks under the Sheriff: Undersheriff, Lieutenant Colonel, Major, Captain, First Lieutenant, Second Lieutenant, Sergeant, Deputy First Class, and Deputy. (Exh. 1; Mark Poland Aff. ¶ 5).

2. Currently, of the LCSO's sworn employees, 13% are women, with about 9% of the women having supervisory or greater leadership positions. (Exh. 2; Michael Chapman Dep. 12:1 – 12:9).

3. As it relates to the operations division, the county is divided into four stations: Dulles Station, Ashburn Station, Eastern Loudoun Station ("ELS"), and Western Loudoun Station ("WLS"). (Poland Aff. ¶ 6) (Exh. 3; Kenneth Dondero Aff. ¶ 5) .

4. The ELS is the busiest of the stations. (Chapman Dep. 66:1 – 66:12).

5. Each station has a Station Commander, which is held by a Captain, and an Assistant Station Commander, which is held by a First Lieutenant. (Poland Aff. ¶ 7) (Dondero Aff. ¶ 6).

6. First Lieutenants in the role of Assistant Station Commanders are expected to be able to perform the duties of the Captain and perform the duties of Station Commander at any time or when needed. (Poland Aff. ¶ 8).

7. The First Lieutenant position is a demanding position and is a pivotal transitionary command staff position in the sense that a First Lieutenant is still in the weeds but taking on bigger picture responsibilities. (Poland Aff. ¶ 9).

8. The First Lieutenant position in the role of Assistant Station Commander is also a demanding position because it involves being a duty officer. (Poland Aff. ¶ 10).

9. The duty officer is essentially the supervisor during a certain shift. When that shift involves non-business hours, the duty officer is the highest ranking officer immediately available and providing supervision. (Poland Aff. ¶ 11).

10. The duty officer during those times is the face of the command staff. (Poland Aff. ¶ 12).

11. The overarching purpose of the duty officer is to be a focal point of information during the shift. (Poland Aff. ¶ 13).

12. The duty officer is provided with updates on incidents that are occurring so that they may provide oversight, guidance, or assistance as necessary. Then, the duty officer is able to provide a summary of the activity to other command staff and to the next shift. (Poland Aff. ¶ 14).

13. By being the focal point of information, it provides consistency in management during the shift and during shift transitions. (Poland Aff. ¶ 15).

14. In law enforcement, there are always issues with staffing from retirements, injuries, training, leave, and long-term leaves of absence. (Poland Aff. ¶ 16).

15. The COVID pandemic exacerbated the issues with officers being out. (Poland Aff. ¶ 17).

16. Staffing is one of the reasons that the duty officer plays such a critical role in the dissemination of information up the chain of command and down the chain of command. (Poland Aff. ¶ 18).

17. Shortly after the start of the COVID pandemic, the LCSO implemented a new duty officer rotation which required a First Lieutenant to be on call during non-business hours, so that there would be a command level officer available. (Exh. 4; John Buckman Dep. 33:3 – 33:16; 74:19 – 75:3) (Exh. 6; Kim Holway Dep. 83:18 – 83:22).

18. The duty officer rotation included on-call hours. (Buckman Dep. 95:20 – 96:4).

19. In July 2020, the First Lieutenants developed a strategy to cover the periods of time after midnight when there was not an assigned duty officer and the First Lieutenant covering would be eligible for on-call time from midnight to 8:30 am. (Exh. 6; Emails - LCSO_055819 – 055820).

20. Plaintiff started working as a deputy with the Loudoun County Sheriff's Office in August of 2002. (Exh. 7; Colette Cunningham Dep. 22:12 – 22:18).

21. On April 7, 2016, Plaintiff was promoted to Sergeant. (Cunningham Dep. 23:12 – 23:19) (Exh. 8; Chandra Evans Aff. ¶ 4, Attachment B – LCSO_000368).

22. On November 2, 2017, Plaintiff was promoted to Second Lieutenant. (Evans Aff. ¶ 5, Attachment C – LCSO_000366).

23. On January 23, 2020, Plaintiff was promoted to First Lieutenant. (Evans Aff. ¶ 6, Attachment D – LCSO_000363) (Cunningham Dep. 23:12 – 23:22).

24. At the time she was promoted to First Lieutenant, Plaintiff was assigned to the ELS and was a duty officer. (Poland Aff. ¶ 23) (Dondero Aff. ¶ 7).

25. During the period of June 2020 to March 2021, the First Lieutenants of the other stations were Buckman (male) (WLS), Earley (male) (Dulles Station), and Holway (female) (Asburn). (Dondero Aff. ¶ 8).

26. As a First Lieutenant at the ELS, Plaintiff was the Assistant Station Commander. (Poland Aff. ¶ 24) (Dondero Aff. ¶ 9).

27. The Station Commander at the ELS was Captain Thomas Gilligan. (Poland Aff. ¶ 25) (Dondero Aff. ¶ 10).

28. Plaintiff and Captain Gilligan did not get along and management issues with one of Plaintiff's subordinates, Sergeant Greg Johnson ("Sgt Johnson"), were exacerbating the tensions in the relationship. (Chapman Dep. 50:7 – 51:1; 59:13 – 60:17) (Poland Aff. ¶ 26) (Dondero Aff. ¶ 11).

29. In the spring of 2020, because it was becoming that noticeable that the working environment was not healthy at the station between Plaintiff and Captain Gilligan Sheriff Chapman and Undersheriff Poland met with Ms. Cunningham. (Poland Aff. ¶ 27).

30. The problems appeared to stem from the management of a subordinate, Sgt. Gregory Johnson, and their different personalities. (Poland Aff. ¶ 28) (Dondero Aff. ¶¶ 12 – 14).

31. Specifically, Ms. Cunningham's style was to be engaged at all levels with subordinates and she took a very demanding, coach-like approach, while Captain Gilligan was more of a laissez-faire approach. (Poland Aff. ¶ 29).

32. Ms. Cunningham never mentioned any concerns that she believed Captain Gilligan was discriminating against her based on her gender. (Poland Aff. ¶ 30).

33. As it appeared that the two could not work together, Sheriff Chapman believed that Plaintiff or Captain Gilligan needed to be moved. (Chapman Dep. 50:7 – 51:20; 59:13 – 60:17) (Poland Aff. ¶ 31).

34. There was a position available under Major Dondero where Captain Gilligan could work and still participate in the operations in the ELS, so in June 2020, Sheriff Chapman pulled Captain Gilligan from the physical station and put him in the position under Major Dondero. (Chapman Dep. 50:7 – 51:1; 59:13 – 60:17) (Poland Aff. ¶ 33) (*See* Cunningham Dep. 68:9 – 69:6) (when asked if she knew the reason for Captain Gilligan's move).

35. It was easier to have Captain Gilligan provide assistance at headquarters than it was to move Ms. Cunningham. (Poland Aff. ¶ 33).

36. Again, as a First Lieutenant, Ms. Cunningham was already expected to be able to perform the duties of a Station Commander, so if Captain Gilligan's time was spent at headquarters, Ms. Cunningham was capable of underfilling as Station Commander. (Poland Aff. ¶ 34) (*See*

Buckman Dep. 92:11 – 92:18) (day-to-day operations could have been performed by the First Lieutenant whether or not a Captain was performing them or not).

37. Additionally, the ELS has more staff than the other stations and at the time had a strong sergeant in Sgt. Sam Harwood. (Poland Aff. ¶ 35)

38. At the time in question, during operations meetings, First Lieutenants and Captains would be reminded that each station needed to be providing assistance and support to the other stations, whether it be guidance, supervision, manpower, or resources. (Poland Aff. ¶ 36).

39. While Captain Gilligan was physically in another location and performing additional duties, he was not transferred at the time. (Poland Aff. ¶ 37).

40. Captain Gilligan remained the Captain of the ELS. (Poland Aff. ¶ 38).

41. Captain Gilligan continued to provide oversight to the ELS while working under Major Dondero and Plaintiff could continue as First Lieutenant. (Chapman Dep. 50:7 – 51:20; 59:13 – 61:19).

42. As he was still the Captain of the ELS, the LCSO did not name an acting Captain. (Poland Aff. ¶ 39).

43. At the LCSO if a position is filled, it is not considered open. (Poland Aff. ¶ 40).

44. If there is an open position because of a retirement, resignation, a promotion, or official transfers, then the Sheriff, in his discretion, may decide to name someone as "acting" in the open position. (Poland Aff. ¶ 41).

45. Being named "acting," while temporary, is an official promotion or change of status. (Poland Aff. ¶ 42).

46. At the LCSO when a position is filled, but the person filling the position is unavailable, the position is underfilled. (Poland Aff. ¶ 43).

47. Positions at the LCSO are constantly being underfilled for different reasons, including but not limited to long-term leave of absences, training, special projects, staffing shortages, etc. (Poland Aff. ¶ 44).

48. Ms. Cunningham was not named "Acting Captain" during the period of June 2020 to March 2021 because that Captain position was not an open position. (Poland Aff. ¶ 45).

49. Sheriff Chapman was aware that there were issues between Plaintiff and Captain Gilligan but was unaware of Plaintiff filing any complaints against him. (Chapman Dep. 49:3 – 49:21).

50. [redacted] (Exh. 9; Elissa Wilk Aff. ¶ 14, Attachment C – LCSO_004344).

51. [redacted] (Wilk Aff. ¶ 14, Attachment C – LCSO_004349).

52. [redacted] (Wilk Aff. ¶ 15, Attachment D – LCSO_002488) (Chapman Dep. 60:7 – 60:17) (Dondero Aff. ¶ 15).

53. [redacted] (Wilk Aff. ¶ 15, Attachment D – LCSO_002473).

54. [redacted] (Wilk Aff. ¶ 15, Attachment D – LCSO_002480).

55. [redacted] (Wilk Aff. ¶ 15, Attachment D – LCSO_002473).

56. [redacted] (Wilk Aff. ¶ 16, Attachment E – LCSO_003317 – 00318).

57. [redacted] (Wilk Aff. ¶ 14, Attachment C – LCSO_004357).

58. [redacted] (Exh. 10; Emails – LCSO_003319 – 003322).

59. [redacted] (Wilk Aff. ¶ 14, Attachment C – LCSO_004374).

60. Sheriff Chapman and Colonel Polland went down to the ELS to discuss the Greg Johnson complaint and her and Captain Gilligan. (Chapman Dep. 60:7 – 60:17).

61. [redacted] (Exh. 11; Emails – LCSO_005336).

62. [redacted] (Wilk Aff. ¶ 14, Attachment C – LCSO_004377).

63. [redacted] (Wilk Aff. ¶ 15, Attachment D – LCSO_002476).

64. Plaintiff believes that Sgt. Johnson's complaint was retaliatory against her for being a woman but does not believe that the LCSO's investigation of Sgt. Johnson's complaint was retaliatory. (Cunningham Dep. 72:4 – 73:17).

65. [redacted] (Wilk Aff. ¶ 15, Attachment D – LCSO_002478 – 2479) (Dondero Aff. ¶¶ 16 – 17).

66. [redacted] (Exh. 6; LCSO_061824 – 061827).

67. [redacted] (Exh. 6; LCSO_061824 – 061827).

68. [redacted] (Exh. 6; LCSO_061827).

69. [redacted] (Exh. 6; LCSO_061824 – 061827).

70. In the second half of 2020, First Lieutenant Holway engaged with Major Dondero on different occasions to discuss new ideas to replace the current duty officer rotation that had been implemented in April 2020. (Dondero Aff. ¶ 18)

71. Major Dondero informed Undersheriff Poland about the First Lieutenants concerns with the duty officer rotation schedule. (Poland Aff. ¶ 19).

72. Undersheriff Poland told Major Dondero that it was a critical role for operations, that command staff would not be getting rid of the role or the non-business hours aspect hours of the role, but that he should be open to suggestions to the role. (Poland Aff. ¶ 20).

73. Generally, First Lieutenants have never liked the duty officer role, no matter the specifics of the schedule, because First Lieutenants are typically the only command staff who get assigned non-business hour shifts. (Poland Aff. ¶ 22) (Dondero Aff. ¶ 19).

74. Ms. Cunningham also asked Major Dondero to be removed from duty officer rotation and Major Dondero discussed the possibility with Lt. Col. Prugh. (Dondero Aff. ¶ 20). During the June 2020 to the March 2021 timeframe, Plaintiff claims she was denied requests for a Monday through Friday schedule but those requests do not have any dates associated with them. (Cunningham Dep. 90:17 – 90:20).

75. [redacted] (Exh. 6; LCSO_061824 – 061827) (Dondero Aff. ¶ 23).

76. These four First Lieutenants all served the same duty officer rotation that was implemented in April 2020. (Dondero Aff. ¶ 24).

77. Major Dondero would provide Ms. Cunningham relief when she would ask to leave early or say she needed time off. (Dondero Aff. ¶ 25).

78. Eventually, in 2021, the LCSO made changes to the duty officer rotation. (Dondero Aff. ¶ 26) (Holway Dep. 85:3 – 85:12).

79. During that timeframe, Major Dondero provided information based on the needs of the specific stations and in conjunction with the current staffing of stations. (Dondero Aff. ¶ 27).

80. Those changes included shifting from having the First Lieutenant from each station serve as duty officer to having only the ELS, Ashburn Station, and Dulles station First Lieutenants serve as duty officer. The WLS First Lieutenant would no longer serve as duty officer rotation. (Dondero Aff. ¶ 28).

81. [redacted] (Wilk Aff. ¶ 17, Attachment F – LCSO_003323 – 003324) (Dondero Aff. ¶¶ 16 – 17).

82. [redacted] (Wilk Aff. ¶ 17, Attachment F – LCSO_003323) (Dondero Aff. ¶¶ 16 – 17).

83. [redacted] (Wilk Aff. ¶ 17, Attachment F – LCSO_003323) (Dondero Aff. ¶¶ 16 – 17).

84. [redacted] (Exh. 12; Emails – LCSO_008091).

85. [redacted] (Exh. 12; LCSO_008090 - 008091).

86. [redacted] (Evans Aff. ¶ 7, Attachment E – LCSO_000218).

87. [redacted] (Wilk Aff. ¶ 14, Attachment C – LCSO_004385) (Cunningham Dep. 239:12 – 239:16).

88. [redacted] (Evans Aff. ¶ 7, Attachment E – LCSO_000217 – 000219).

89. [redacted] (Evans Aff. ¶ 7, Attachment E – LCSO_000217 – 000219).

90. Plaintiff first engaged with the EEOC in June 2020. (Cunningham Dep. 110:11 – 110:19).

91. Plaintiff engaged the EEOC at the time because she was having problems with Captain Gilligan as soon as she started working with him. (Cunningham Dep. 112:15 – 114:20).

92. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") on March 18, 2021. (Exh. 10; EEOC Charge of Discrimination).

93. The Charge of Discrimination claims that from when Plaintiff was promoted to First Lieutenant in January 2020 "until June 2020, Captain Gilligan harassed me constantly, warning

me to be very careful because my subordinate was keeping a thick file on me" and that she "made several complaints." (Charge of Discrimination).

94. The Charge of Discrimination claims that when Plaintiff was highest ranking deputy in the ELS she "was still on rotating patrol shifts and out of the office 2-3 days a week but was expected to fill the administrative duties of Captain," "was working seven days a week from June-January," and "received overtime pay at a Lieutenants pay grade." (Charge of Discrimination).

95. The Charge of Discrimination claims that Plaintiff asked "several times to adjust my schedule to Monday-Friday to facilitate my job duties and was not accommodated." (Charge of Discrimination).

96. The Charge of Discrimination claims that there were eight promotions in February 2021 that were all men. (Charge of Discrimination).

97. The Charge of Discrimination claims that when Captain Alhmen was transferred from the WLS to the ELS that the First Lieutenant at the WLS was afforded a Monday-Friday Schedule. (Charge of Discrimination).

98. When asked what she was claiming to be retaliated for, Plaintiff responded "for my complaint against – to the EEOC." (Cunningham Dep. 97:2 – 97:6).

99. When asked if she was aware of any retaliation before she made the EEOC complaint, she responded "not that I am aware of." (Cunningham Dep. 97:7 – 97:9).

100. [redacted] (Exh.14 ; Elaine Crawford Aff. ¶ 4).

101. [redacted] (Crawford Aff. ¶ 6).

102. [redacted] (Crawford Aff. ¶ 7).

**STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56(c), a motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The essence of the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to the jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" and the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. After that required showing, however, the party opposing the motion must set forth specific facts, supported by evidence, showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. The opposing party may not rest on their mere pleadings. *Celotex*, 477 U.S. at 324.

"In determining whether summary judgment is appropriate, courts determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Odom v. South Carolina Dept. of Corrections*, 349 F.3d 765, 769 (4th Cir. 2003). "It is also true that 'the mere existence of some disputed facts does not require that a case go to trial', rather, '[t]he disputed facts must be material to an issue

necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict.'" *Poole v. Pass*, 351 F.Supp.2d 473, 478 (E.D. Va. 2005) (quoting *Thompson Everett, Inc. v. Nat'l Cable Adver.*, LP, 57 F.3d 1317, 1323 (4th Cir. 1995)). A mere scintilla of proof will not prevent the entry of summary judgment. *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).

## ARGUMENT

Plaintiff cannot prove a Title VII gender discrimination claim or Title VII retaliation claim, and Defendant is entitled to judgement as a matter of law.

### I. Plaintiff's Charge of Discrimination and her Title VII claims.

The Fourth Circuit has held "that the factual allegations made in formal litigation must correspond to those set forth in the administrative charge." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005); *Sydnor v. Fairfax Cnty., Va.*, 681 F.3d 591, 593 (4th Cir. 2012) ("scope of the plaintiff's right to file a federal lawsuit is determined by the charge's contents") (citations omitted). For example, "[a] claim will also typically be barred if the administrative charge alleges one type of discrimination—such as discriminatory failure to promote—and the claim encompasses another type—such as discrimination in pay and benefits. *Id.* (citing *Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 963–64 (4th Cir.1996); *Evans,* 80 F.3d at 963–64; *Lawson v. Burlington Indus., Inc.,* 683 F.2d 862, 863–64 (4th Cir. 1982) (claim of discriminatory failure to rehire barred because charge only alleged illegal layoff)). "Thus, 'a plaintiff fails to exhaust his administrative remedies where . . . his administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit." *Sydnor*, 681 F.3d at 593 (quoting *Chacko,* 429 F.3d at 506). In other words, Title VII litigation is not a game of whack-a-mole.

Plaintiff's Charge of Discrimination in this matter covers a time period from January 1, 2020 through March 4, 2021. (UMF No. 93). The adverse actions alleged in the Charge of Discrimination, however, are that Plaintiff was (1) performing the duties of a captain but not named "Acting Captain" or paid as a captain, (2) was denied a Monday through Friday schedule while performing the duties of a captain, and (3) was "demoted" to her rank of First Lieutenant and not promoted to captain despite performing the duties of a captain. (UMF No. 95). Consequently, those are the controlling claims in this case.

## II. <u>Plaintiff cannot succeed on her Title VII discrimination claims based on gender.</u>

While not artfully pled, Plaintiff's Title VII discrimination claim is, essentially, two-fold, asserting a disparate treatment claim and a pay disparity claim.

### A. Plaintiff cannot establish a disparate treatment claim based on her gender.

To survive a motion for summary judgment a plaintiff must first "establish a prima facie case of disparate treatment, [and] a plaintiff must prove four elements: '(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'" *Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 714 (4th Cir. 2024) (quoting *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)). "The similarly situated element requires a plaintiff to 'provide evidence that the proposed comparators are not just similar in *some* respects, but 'similarly-situated *in all respects*.'" *Id.* (emphasis original) (quoting *Spencer v. Va. State Univ.*, 919 F.3d 199, 207–08 (4th Cir. 2019) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Thus, "the plaintiff must prove that she and the comparator 'dealt with the same supervisor, were subject to the same standards[,] and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"

*Id.* (quoting *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019)). While, "a comparison between similar employees will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstance," *Haynes*, 922 F.3d. at 223, it remains that "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful," *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008). *Id.*

Based on the undisputed facts of this case, Plaintiff cannot establish that there was an adverse employment action or that she was subjected to different treatment from similarly situated male employees. First, Plaintiff cannot identify a similarly situated employee. The potential comparators in this case are First Lieutenants Buckman (male), Earley (male), and Holway (female) (UMF No. 25). While they were similar in rank and all served as assistant station commanders, their stations differed in size, staffing, and activity and each of the First Lieutenants reported to different captains. (UMF Nos. 3 – 6, 79 – 80). The circumstances of each First Lieutenant involved meaningful differences, making them insufficient comparators. *See Cosby*, 93 F.4th at 714 ("the plaintiff must prove that she and the comparator 'dealt with the same supervisor, were subject to the same standards[,] and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it'"). In turn, Plaintiff's disparate treatment claim missteps out of the gate.

Even if they were proper comparators, Plaintiff cannot establish any adverse actions for which the possible comparators were not subject to. The alleged adverse actions in this matter are that Plaintiff was (1) performing the duties of a captain but not named "Acting Captain" or paid as a captain, (2) denied a Monday through Friday schedule while performing the duties of a captain,

and (3) "demoted" to her rank of First Lieutenant and not promoted to captain despite performing the duties of a captain. (UMF No. 95).

Plaintiff's claims confuse what is expected of a First Lieutenant with an adverse action. When Captain Gilligan was tasked to assist out of headquarters rather than the ELS, he was not officially transferred. (UMF No. 39, 42). As a result, there was no Captain position vacant, which meant there was no reason to name anyone "Acting Captain" because the position was still filled. (UMF Nos. 42 – 46). The practical implication from Captain Gilligan's presence at headquarters, however, was that Ms. Cunningham, as a First Lieutenant and Assistant Station Commander, was expected to perform the roles of Station Commander as needed. (UMF Nos. 6 – 7, 36). That is how the Captain/Station Commander and First Lieutenant/Assistant Station Commander roles operate. That is the job, not an adverse action.

Furthermore, all of Plaintiff's possible comparator First Lieutenants at the time were essentially treated the same. None of the First Lieutenants were named acting captain of the ELS or their respective stations. (UMF Nos. 42 – 48, 89). All of the First Lieutenants were attempting to change the duty officer rotation and get a Monday through Friday schedule but none of them got one. (UMF Nos. 66 – 76). None of the First Lieutenants were promoted to captain of the ELS; rather, another captain was transferred to become the ELS captain. (UMF No. 88).

Under the circumstances of this case, the actions do not rise to the level of a Title VII adverse action and the comparators were treated similarly. Accordingly, Plaintiff cannot establish Title VII disparate treatment claim and Defendant is entitled to judgment as a matter of law.

**B. Plaintiff cannot establish a pay disparity based on gender.**

"A [Title VII] prima facie pay-disparity case under *McDonnell Douglas* requires a plaintiff to establish (1) she is a member of a protected class, (2) she was performing her job satisfactorily,

(3) an adverse employment action occurred, and (4) the circumstances suggest an unlawfully discriminatory motive." *Spencer v. Virginia State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019), *as amended* (Mar. 26, 2019) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "Where, as here, the prima facie case of wage discrimination is based on comparators, the plaintiff must show that she is paid less than men in similar jobs." *Id.* (citing *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir. 1994)).

While the Equal Pay Act requires the compared jobs to be "equal," *see infra*, "Title VII requires the compared jobs to be only 'similar.'" *Id.* When determining whether two jobs are similar, "courts consider 'whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision.'" *Id.* (quoting *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005) (citing *Herster v. Bd. of Supervisors of Louisiana State Univ.*, 887 F.3d 177, 185 (5th Cir. 2018) (stating that a "variety of factors are considered when determining whether a comparator is similarly situated, including job responsibility, experience, and qualifications.")).

Here, Plaintiff cannot show a disparity in pay from June 2020 through March 2021 when compared to Captains. In 2020, Plaintiff's W2 wages [redacted] (UMF No. 101). In 2020, there were seven individuals that held the rank of Captain in the operations division for the full year: Captain Ahlemann's 2020 W2 wages [redacted] Captain DeLitta's 2020 W2 wages [redacted]; Captain Gilligan's W2 wages [redacted] Captain Hibberd's W2 wages [redacted]; Captain McDonald's W2 wages [redacted] Captain Schleiden's W2 wages [redacted]. (UMF No. 102). She made approximately the same

amount as two of the male captains, and made more than the captain who, ultimately, took over as the captain of the ELS. As a result, Plaintiff cannot establish a pay disparity and Title VII pay disparity claim fails.

Additionally, "[o]nce a plaintiff establishes a prima facie case, the burden of production shifts to the employer to proffer a legitimate, nondiscriminatory explanation for the wage disparity." *Spencer*, 919 F.3d at 208 (citing *Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 216–17 (4th Cir. 2016)). Even if she established a prima facie case, there are legitimate reasons for any pay differences as they involve different ranks, First Lieutenant vs. Captain. The fact that a First Lieutenant may perform duties of a Captain does nothing to change the fact that there is rank system in place or that First Lieutenants are expected to be able to perform the duties of a Captain. (UMF Nos. 6 – 13).

Most telling, however, as to Plaintiff's pay disparity claim is the fact that she is not claiming any damages that come close to resembling pay disparity damages. First, in her initial disclosures, she simply provided that "damages are still being calculated and will be provided." (Exh. 15; Pl.'s Initial Disclosures). Then, in her Answers to Interrogatories, when asked to describe all the "substantial economic loss, including salary, bonuses, benefits, and other compensations" and to itemize the damages she suffered as alleged in the Amended Complaint, she makes no claim for lost wages. (Exh. 16; Pl.'s Answers to Interrogatory Nos. 11, 14 p. 14, 16). She is trying to make smoke when there is no fire.

Accordingly, Plaintiff cannot establish Title VII pay disparity claim and Defendant is entitled to judgment as a matter of law.

## III. <u>Plaintiff cannot succeed on her Title VII retaliation claim.</u>

A Title VII retaliation claim under the *McDonnell Douglas* framework, requires a plaintiff to establish a similar prima facie: (1) "that [she] engaged in protected activity," (2) "that [her employer] took adverse action against [her]," and (3) "that a causal relationship existed between the protected activity and the adverse employment activity." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (citations omitted); *see also Noonan v. Consol. Shoe Co., Inc.*, 84 F.4th 566, 574 (4th Cir. 2023) (applying the same retaliation framework for Title VII retaliation and Equal Pay Act retaliation claims).

**A. Plaintiff did not engage in protected activity.**

"[F]or an employee's activity to constitute protected 'opposition,' she must show (1) that she reasonably believed that the employment action she opposed constituted a Title VII violation and (2) that her conduct in opposition was reasonable." *Netter v. Barnes*, 908 F.3d 932, 937–38 (4th Cir. 2018) (internal citations omitted). "An employee's belief that a Title VII violation has occurred may be completely reasonable, but if she fails to tie complaints about workplace conduct to her protected status, the employer could not have retaliated for engaging in a protected activity." *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 412 (4th Cir. 2022). "Without notice that an employee is complaining about discrimination based on their protected status, an employer has no means to distinguish between protected conduct and frivolous complaints about workplace disagreements unprotected by the law." *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 412 (4th Cir. 2022) (citing *Hawkins*, 203 F.3d at 280 ("[I]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.").

When confronted directly about retaliation, Plaintiff unequivocally testified that she was retaliated against because of her complaint to the EEOC and that she was unaware of any retaliation before her Complaint to the EEOC. (UMF Nos. 98 – 99). The basis for Title VII retaliation claim,

however, is dependent on alleged adverse actions that occurred prior to the filing of her EEOC Charge of Discrimination on March 18, 2021. Thus, based on the undisputed of the facts of this case her alleged protected activity occurred after the alleged adverse actions and Plaintiff's Title VII retaliation claim fails.

Further, to the extent Plaintiff tries to muddy her testimony, asserting that she made complaints about Captain Gilligan before her Charge of Discrimination, those complaints fail to qualify as protected activity. Plaintiff cannot articulate any specific complaints against Captain Gilligan. (Cunningham Dep. 58:19 – 59:8l; 183:2 – 185:22). None of the issues between Plaintiff and Captain Gilligan were ever perceived as being gender related discrimination. (UMF Nos. 29 – 33, 49, 84 – 85). Rather, it was all viewed and addressed as management style conflicts and personality issues between the two. (UMF Nos. 29 – 33, 49, 84 – 85). Without any basis to deem a complaint as premised on gender discrimination it cannot qualify as protected activity. *See McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 412 (4th Cir. 2022) ("Without notice that an employee is complaining about discrimination based on their protected status, an employer has no means to distinguish between protected conduct and frivolous complaints about workplace disagreements unprotected by the law.") (citing *Hawkins*, 203 F.3d at 280 ("[I]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff."). As a result, Plaintiff cannot establish that she engaged in protected activity and her Title VII retaliation claim fails.

Accordingly, Defendant is entitled to judgment as a matter of law as to Plaintiff's Title VII retaliation claim.

**B. There were no adverse actions.**

"An alleged retaliatory action must be 'materially adverse,' meaning that the plaintiff must show that the action 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Laird v. Fairfax Cnty., Virginia*, 978 F.3d 887, 893 (4th Cir. 2020) (*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 54 (2006)). "In other words, the harm must be a *significant detriment*, not relatively insubstantial or trivial." *Id.* (emphasis original) (internal quotation marks and citations omitted). The Fourth Circuit has asked "[h]ow adverse must retaliatory conduct be?" and stated that [i]t must be materially adverse, which means the plaintiff must show significant harm that could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Noonan v. Consol. Shoe Co., Inc.*, 84 F.4th 566, 575 (4th Cir. 2023) (internal quotation marks and citations omitted). "In making this determination, context matters." *Id*. "[T]his is an objective standard, adopting the lens of a "*reasonable* employee." *Id.* (emphasis original).

Again, here, the alleged adverse actions are that Plaintiff was (1) performing the duties of a captain but not named "Acting Captain" or paid as a captain, (2) denied a Monday through Friday schedule while performing the duties of a captain, and (3) "demoted" to her rank of First Lieutenant and not promoted to captain despite performing the duties of a captain. (UMF No. 95). Under the circumstances none of these qualify as adverse actions.

Again, as argued above, even if they were proper comparators, all of Plaintiff's comparator First Lieutenant at the time were essentially treated the same. None of the First Lieutenants were named acting captain of the ELS. (UMF Nos. 42 – 48, 89). When Captain Gilligan was tasked to assist out of headquarters rather than the ELS, he was not officially transferred. (UMF No. 39, 42). As a result, there was no Captain position vacant, which means there was no reason to name anyone "Acting Captain." (UMF Nos. 42 – 46). The practical implication from Captain Gilligan's

presence at headquarters, however, was that Ms. Cunningham, as a First Lieutenant and Assistant Station Commander, was expected to perform the roles of Station Commander as needed. (UMF Nos. 6 – 7, 36). That is how the Captain/Station Commander and First Lieutenant/Assistant Station Commander roles operate. That is the job, not an adverse action.

All of the First Lieutenants were attempting to get a Monday through Friday schedule, and none of them got one. (UMF Nos. 66 – 76). None of the First Lieutenants were promoted to captain of the ELS, another Captain was transferred to become the ELS captain. (UMF Nos. 66 – 76). None of the First Lieutenants were promoted to captain of the ELS; rather, another captain was transferred to become the ELS captain. (UMF No. 88).

All of these actions occurred regardless of any alleged protected activity but all had the same outcomes. Under the circumstances of this case, the actions do not rise to the level of a Title VII adverse action. As a result, Plaintiff's Title VII retaliation claim fails, and Defendant is entitled to judgment as a matter of law.

**C. There is no evidence of causation.**

"For both participation and opposition claims, the plaintiff bears the burden of establishing that unlawful retaliation 'would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Netter v. Barnes*, 908 F.3d 932, 938 (4th Cir. 2018) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). "This but-for causation requirement is stricter than the lessened causation standard for discrimination claims' under which a plaintiff need only show that race, color, religion, sex, or national origin was a motivating factor' for an adverse action by an employer." *Netter v. Barnes,* 908 F.3d 932, 938 (4th Cir. 2018) (internal citations and quotations marks omitted).

Here, there is no evidence that any of the decision makers regarding the alleged adverse actions possessed any discriminatory animus. Again, there is no evidence that any of the decisions makers was aware of any complaint of discrimination. (UMF Nos. 49, 98 – 99). Furthermore, Plaintiff cannot specify as when her alleged protective activity occurred, so there is no way for her to avail herself to a temporal proximity argument. Plaintiff lacks even a scintilla of evidence. As a result, Plaintiff cannot establish evidence of causation, and her Title VII retaliation claims fails, and Defendant is entitled to judgment as a matter of law.

**D. Even if Plaintiff could make a prima facie case of retaliation, there were legitimate business reasons for the alleged adverse actions.**

After a plaintiff makes a prima facie showing, again, "[t]he burden then shifts to the [employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Laird*, 978 F.3d at 893. "Unlike discrimination plaintiffs, retaliation plaintiffs are limited to 'traditional principles of but-for causation' and must be able to prove that 'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Foster,* 787 F.3d at 249 (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). Essentially, "[a] plaintiff who can show that retaliation was the real reason for the [adverse employment action], will necessarily be able to show that the harm would not have occurred in the absence of-that is, but for-the defendant's conduct" *Id*. at 252 (alteration in original) (internal quotation marks and citations omitted).

As it relates to the position of "Acting Captain" and promotion, again, when Captain Gilligan was tasked to assist out of headquarters rather than the ELS, he was not officially transferred. (UMF No. 39, 42). As a result, there was no Captain position vacant, which means there was no reason to name an "Acting Captain." (UMF Nos. 42 – 46). The practical implication from Captain Gilligan's presence at headquarters, however, was that Ms. Cunningham, as a First

Lieutenant and Assistant Station Commander, was expected to perform the roles of Station Commander as needed while also performing her role as duty officer. (UMF Nos. 6 – 16, 36). That is how the Captain/Station Commander and First Lieutenant/Assistant Station Commander roles operate. The duty officer role is an important role, and no changes were made to any duty officers schedules at the time. (UMF Nos. 73 – 77).

Ultimately, the alleged adverse actions were simply part of the job or staffing decisions that applied to everyone. As a result, they were non-discriminatory actions and Plaintiff's Title VII retaliation claims fails, and Defendant is entitled to judgment as a matter of law.

## CONCLUSION

Based on the foregoing, this Court should enter judgment on behalf of the Defendant, Loudoun County Sheriff's Office, as to Plaintiff's remaining claim in this action, Title VII discrimination and retaliation based on gender (Count One).

Respectfully submitted,

*/s/ Alexander Francuzenko*

Alexander Francuzenko, VSB# 36510
Philip C. Krone, VSB# 87723
Cook Craig & Francuzenko, PLLC
3050 Chain Bridge Road, Suite 200
Fairfax, VA 22030
T: (703) 865-7480
F: (703) 434-3510
alex@cookcraig.com
pkrone@cookcraig.com
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on this **2nd day of January 2025**; I electronically filed the foregoing Motion for Summary Judgment with the Clerk of Court using the CM/ECF system which sent a copy to counsel for each the below named parities:

Thomas K. Plofchan, Esq.
Jacqueline A. Kramer, Esq.
WESTLAKE LEGAL GROUP
46175 Westlake Drive, Suite 320
Potomac Falls, Virginia 20165
(703) 406-7616 (phone)
(703) 444-9498 (fax)
tplofchan@westlakelegal.com
jkramer@westlakelegal.com
*Counsel for Plaintiff*

*/s/ Alexander Francuzenko*
Alexander Francuzenko, VSB# 36510
Philip C. Krone, VSB# 87723
Cook Craig & Francuzenko, PLLC
3050 Chain Bridge Road, Suite 200
Fairfax, VA 22030
T: (703) 865-7480
F: (703) 434-3510
alex@cookcraig.com
pkrone@cookcraig.com
*Counsel for Defendants*